IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NEW HAMPSHIRE INSURANCE COMPANY,<br>Plaintiff,<br><br>vs.<br><br>NICHOLAS Dagnone, *in personam* and<br>A Certain 1993 47-Foot Bluewater Motor Vessel,<br>her engines, tackle, apparel, appurtenances, etc.,<br>*in rem*,<br>Defendant/Third Party Plaintiff<br>Defendants-in-Counterclaim,<br>vs.<br><br>THE TALARIA COMPANY, LLC,<br>d/b/a THE HINCKLEY COMPANY,<br>a/k/a HINCKLEY YACHT SERVICES,<br>Third Party Defendant/<br>Plaintiff-in-Counterclaim. | CIVIL ACTION NO. 04-122 ML |

**THIRD PARTY DEFENDANT'S POST-TRIAL MEMORANDUM**

NOW COMES third party defendant, The Talaria Company, LLC, doing business as The Hinckley Company and Hinckley Yacht Services (hereinafter referred to as "Hinckley"), and by its attorney, submits this Post-Trial Memorandum in accordance with this Honorable Court's instructions on April 24, 2006.

I. Introduction

Third-party plaintiff, Nicholas Dagnone, proceeds against Hinckley for storm-related damages to his motor boat. A one-day bench trial occurred on April 24, 2006. Third-party plaintiff presented his evidence through live testimony of Mr. Dagnone, as well as the deposition testimony of Donald Theodore Beaumont and Matthew Marrone. Third-party defendant presented its evidence through the live testimony of James A. Kerr, James Hilton and Robert

Hood. Upon application and approval, third-party defendant is also submitting the deposition of Thomas R. Hill in lieu of trial testimony.

II. Proof, Factual Findings and Conclusions of Law

The evidence establishes that Mr. Dagnone is the owner of a 46-foot motor vessel manufactured by Bluewater Marine, Inc. (Defendant's Exhibits N and O). The evidence also shows that Hinckley operates a marine repair and storage facility in Portsmouth, Rhode Island. (Trial testimony of James Kerr). In early November of 2003, Mr. Dagnone contacted Hinckley and spoke with James Kerr, its Senior Service Manager. (Trial testimony of Nicholas Dagnone and James Kerr). Mr. Dagnone inquired about the possibility of storing his boat ashore at the shipyard for the upcoming winter season. (Trial testimony of Nicholas Dagnone and James Kerr). Mr. Dagnone told Mr. Kerr that he would deliver the boat to Hinckley on November 15, 2003. (Trial testimony of James Kerr).

The evidence establishes that Mr. Dagnone hired Donald Theodore Beaumont to deliver the boat from Goat Island Marina in Newport to Portsmouth. (Trial testimony of Nicholas Dagnone; Deposition testimony of Donald Beaumont). Captain Beaumont delivered the boat to Hinckley's yard on or about Saturday, November 22, 2003. (Deposition testimony of Donald Beaumont; Trial testimony of James Kerr and Defendant's Exhibit A). Captain Beaumont left the boat tied up to a work dock and departed the yard. (Deposition testimony of Donald Beaumont; Trial testimony of James Kerr and Plaintiff's Exhibit 15). The evidence indicates that shipyard personnel discovered the boat at the work dock on Monday, November 24, 2003, and thereafter, one of Hinckley's Service Managers spoke with Mr. Dagnone about the necessity of tendering a partial payment and signing a written storage agreement before the boat would be

hauled. (Trial testimony of James Kerr and James Hilton; Defendant's Exhibit A). The evidence shows that despite repeated requests for a signed agreement and partial payment, Mr. Dagnone did not deliver an executed copy of the agreement or tender a payment until December 3, 2003. (Trial testimony of James Kerr; Plaintiff's Exhibits 1-3). On that day, Mr. Kerr telephoned Mr. Dagnone in Florida and reminded him about the need for payment and receipt of a signed written agreement. (Trial testimony of James Kerr).

The evidence supports a finding that Mr. Dagnone signed a facsimile copy of the storage contract in Florida on December 3, 2003 and mailed a check for $1,000.00 to the boatyard. (Trial testimony of Nicholas Dagnone and James Kerr; Plaintiff's Exhibit 1-3). Mr. Kerr received the partial payment and executed agreement on December 10, 2003. (Trial testimony of James Kerr). The evidence supports a finding that Mr. Kerr told Mr. Dagnone on December 3, 2003 that his boat would be put in line and hauled out during the middle of the following week on or about December 10, 2003. (Trial testimony of James Kerr; Defendant's Exhibit A).

The evidence establishes that prior to hauling the defendant's vessel, high winds struck the Portsmouth, Rhode Island area during the overnight hours of Saturday and Sunday, December 6-7, 2003. (Deposition testimony of Thomas Hill; Plaintiff's Exhibits 16 and 20). Aware of the forecast, Hinckley's personnel moved several boats, including Mr. Dagnone's boat, to more protected locations within the boat basin prior to the storm. (Trial testimony of James Kerr; Defendant's Exhibit F). Hinckley's personnel secured Mr. Dagnone's vessel to a floating dock (A-dock) using the boat's own lines. (Trial testimony of James Kerr; Defendant's Exhibit F). The evidence supports a finding that the wind and sea conditions over that weekend exceeded the forecast and caused considerable damage to several docks and boats stored afloat in the marina.

(Trial testimony of Thomas Hill; Plaintiff's Exhibits 16 and 20).

Regarding Mr. Dagnone's boat, the evidence establishes that the lines were new in 2002 and showed no outward signs of wear or defect. (Trial testimony of Nicholas Dagnone, James Kerr and James Hilton). The evidence supports a finding that the lines to Mr. Dagnone's vessel parted, and his boat drifted across the boat basin to another dock and hit the sterns of two (2) sailboats. (Trial testimony of James Kerr; Defendant's Exhibit F). Mr. Dagnone's boat was eventually secured to B-dock during the storm by another person at the marina. (Trial testimony of James Kerr; Defendant's Exhibit F).

With respect to the physical damage to Mr. Dagnone's boat, the evidence indicates that Mr. Dagnone requested an estimate from Hinckley in February of 2004. (Trial testimony of Nicholas Dagnone and James Hilton; Plaintiff's Exhibit 5). The boatyard provided Mr. Dagnone with a repair estimate of $38,327.00 on February 23, 2004. (Trial testimony of James Hilton; Defendant's Exhibit 5).

IV. Third Party Defendant's Memorandum of Law

This Court has admiralty and maritime jurisdiction pursuant to Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. §1333. *Third Party Complaint*, dated June 23, 2004, para. 3; *Answer and Counterclaim*, dated July 19, 2004, para. 4 at 7.

Mr. Dagnone asserts that a contract of bailment existed between the parties when his boat was damaged. It has long been established under admiralty practice that the law of bailment applies to a suit for damage to or loss of a vessel that has been left with another for repair or storage. See, *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 924 F.2d 16, 18-19 (1st Cir. 1991) (citation omitted); *Chanler v. Wayfarer Marine Corporation*, 302 F. Supp. 282, 285 (D. Me

1969). See also, *Grabbert v. Marina Parks, Inc.*, 101 R.I. 164, 169, 221 A.2d 455, 458 (1966). A bailment, of course, is the delivery of goods by its owner to another for a specific purpose, and the acceptance of those goods by the other with the express or implied promise that the goods will be returned in an undamaged condition after the purpose of the delivery has been fulfilled. *Goudy & Stevens, Inc.*, 924 F.2d at 18, citing 9 *Williston on Contracts*, §1030, pp. 875-76.

In order for the bailee to be held liable for damages to the bailed property, the bailor must establish that the bailee acted negligently in the performance of its duties, and that its negligence was the proximate cause of the damage. *Goudy & Stevens, Inc.*, 924 F.2d at 18. When the bailor shows delivery to the bailee and the bailee's failure to return the thing bailed in an undamaged condition, he makes out a *prima facie* case of negligence against the bailee. *Goudy & Stevens, Inc.*, 924 F.2d at 18, citing *Chanler*, 302 F. Supp. at 285. In such a case, a presumption of negligence on the part of the bailee arises.[1] *Id.*

The presumption of negligence is a rebuttable one, which may be overcome by a showing that either the damage was not caused by any act or omission of the bailee, or that the bailee exercised due care in all that it did with respect to the bailed property. *Id.* When the bailor has made out a *prima facie* case, it is the duty of the bailee to come forward with evidence to explain its default by showing facts and circumstances sufficient in law to exonerate it from liability for the damage. *Id.*, citing *Trawler Jeanne d'Arc v. Casco Trawlers*, 260 F. Supp. 124, 138 (D. Me. 1966).

[1]The presumption does not shift the burden of proof. *Chanler*, 302 F. Supp. at 285. The burden of proof never shifts, and the risk of non-persuasion remains upon the bailor. *Id.*

There is an important caveat: No inference or presumption of negligence may arise against the bailee if its possession of the bailed item is not exclusive of that of the bailor. *Goudy & Stevens, Inc.*, 924 F.2d at 19.

In the case at bar, the evidence supports a factual finding that both parties had equal, unrestricted access to the vessel at all times prior to the storm. Mr. Dagnone's contractor, Ted Beaumont, testified by deposition that he had been retained by Mr. Dagnone to deliver the boat from Goat Island Marina and to winterize the various systems aboard the boat after it was removed from the water. (Deposition testimony of Donald Beaumont). He testified that he visited the boatyard on at least three (3) occasions between November 22, 2003, the day he dropped off the boat, and the date of the storm, and that he physically boarded the boat on the last visit to check the condition of the bilge. (Deposition testimony of Donald Beaumont). Captain Beaumont stated in his deposition that on his last visit to the boatyard, he inquired of James Kerr, Senior Service Manager at the time, regarding the reason why the boat had not been hauled. (Deposition testimony of Donald Beaumont). As a result of this conversation, Mr. Beaumont called Mr. Dagnone to inform him that the boat would not be hauled without a signed storage contract. (Deposition testimony of Donald Beaumont).

Based upon the testimony of Captain Beaumont, there is no basis for an inference or presumption of negligence in this case. As shown by his actions after delivery of the boat, Captain Beaumont's exercise of control over Mr. Dagnone's property was unfettered during the period of time in question. The basis for the presumption should therefore fail because neither party was in a better position than the other to explain the cause of the damage. *Goudy & Stevens, Inc.*, 924 F.2d at 19-20.

Unaided by the presumption of negligence, Mr. Dagnone bears the burden of proof to establish that the shipyard acted negligently in the performance of its duties and that its lack of due care was the proximate cause of the loss. *Goudy & Stevens, Inc.*, 924 F.2d at 19.

In the event that a bailment is found to exist, the central question presented is whether the damage to defendant's boat was caused by an inevitable accident, or the negligence of Hinckley's personnel in the handling of the boat. It is well established that the owner of a vessel cannot recover for damages caused by an inevitable accident (*vis major)*, or *vis divina*, that is a so-called act of God. *Hicks v. Tolchester Marina, Inc.*, 1984 AMC 2027 (D. Maryland 1983); see also, *Chanler*, 302 F. Supp. at 286. In *Hicks*, a severe thunderstorm struck a marina, and extraordinarily high winds associated with the storm caused the plaintiff's boat to lift out of its cradle and hit the ground. *Hicks*, 1984 AMC at 20__. In analyzing the case, the District Court defined an "act of God" as follows:

> An act of God has been described as a disturbance of such unanticipated force and severity as would clearly preclude charging the defendant with responsibility for damage occasioned by the defendant's failure to guard against it in the protection of property committed to its custody.

*Id.* (citation omitted). For the bailee to exonerate itself from liability based on the contention that the damage was caused by an act of God, the boatyard has the burden of proving not only that the storm constituted an act of God, but also that it was not guilty of negligence which contributed to causing the damage. *Id.*

Applying these principles to the case at hand, the evidence establishes that the storm of December 6 and 7, 2003, had an unforeseeable effect on the marina and the boats stored afloat therein. (Deposition testimony of Thomas Hill). The higher than forecasted winds, combined

with the direction and the unique configuration of the boat basin, caused considerable damage to the floating docks and boats. (Deposition testimony of Thomas Hill). The evidence shows that Hinckley's personnel could not have reasonably anticipated the destructive force of the wind and sea conditions trapped within the boat basin that night. (Deposition testimony of Thomas Hill).

In light of the foregoing, Hinckley has successfully rebutted the inference or presumption of negligence by showing that the loss in question was caused by inevitable accident or an act of God such that Mr. Dagnone must affirmatively show a negligent act or omission on the part of the boatyard.

Mr. Dagnone charges the boatyard with being in breach of its agreement by not hauling his boat prior to the windstorm. The evidence, however, establishes that haul-outs are performed on a "first come, first serve" basis. (Trial testimony of James Kerr). Mr. Dagnone delivered his signed storage contract by facsimile on December 3, 2003, at which time Mr. Kerr told him that subject to existing haul out orders, his boat would be brought ashore the middle of the following week, on or about December 10, 2003. (Trial testimony of James Kerr; Defendant's Exhibit A). There is no credible evidence to support a finding that Hinckley made a representation to remove Mr. Dagnone's boat from the water before December 10, 2003. On the whole, the evidence shows that there was no undue delay in scheduling the removal of Mr. Dagnone's boat given the prior commitments of the boatyard. See, *Gelb v. Minneford Yacht Yard, Inc.*, 108 F. Supp. 211, 215 (SDNY 1952).

Mr. Dagnone also contends that Hinckley was negligent in moving his boat from the work dock where Captain Beaumont had left the boat to a slip. The evidence, however, establishes that the work dock was in a more exposed location, and by moving it into the slip

area, the boat was better secured and protected from the forecasted weather. (Trial testimony of James Kerr).

Mr. Dagnone also alleges that Hinckley's personnel were negligent in securing the boat. The evidence, however, supports a finding that the lines aboard Mr. Dagnone's boat (which were used by Hinckley's personnel to secure the boat to the dock) were fairly new, and they did not show any outward signs of wear or defect. (Trial testimony of Nicholas Dagnone, James Kerr and James Hilton). The evidence shows that although a cleat did bend in Mr. Dagnone's slip (Trial testimony of James Kerr; Defendant's Exhibit F), the proximate cause of his loss was the parting of all his dock lines that night which allowed the boat to float freely in the boat basin and allide with others. (Deposition testimony of Thomas Hill).

Of all the evidence, factual findings support the conclusion that Hinckley's personnel took reasonable and sufficient precautions in anticipation of the then existing weather forecast to exonerate itself from liability for the storm damage to Mr. Dagnone's boat. The evidence supports a finding that Hinckley's personnel monitored the weather forecast prior to the weekend in question. Because small craft and possible gale warnings were predicted, Hinckley re-located several vessels, including Mr. Dagnone's boat, to more protected locations within the boat basin. The official weather forecast of 25-35 knot winds (Plaintiff's Exhibit 20) gave no hint that the expected wind and sea conditions would combine forces to wreak havoc to the structures and boats within the basin.[2]

---

[2]Dagnone relies, in part, on *Snyder v. Four Winds Sailboat Centre, Ltd.*, 701 F.2d 251 (2d Cir. 1983). In *Snyder*, the Second Circuit correctly pointed out that the inquiry whether the marina failed to act in a reasonably prudent manner turns of *foreseeability*. *Snyder*, 701 F.2d at 253. (*Emphasis added.*)

With respect to Mr. Dagnone's allegation that a broken dock cleat caused the loss, that failure, in and by itself, does not establish liability either in contract or tort. The evidence shows the docks and fittings were in good condition prior to the wind storm, and that their construction was consistent with good marine practices. (Deposition testimony of Thomas Hill; Defendant's Exhibit R). There is no evidence to suggest that Hinckley failed to inspect or maintain the docks or their fittings prior to the storm.

On all the evidence, the factual findings support the conclusion that the damage to Mr. Dagnone's boat was caused by a violent wind storm, the effect of which could not reasonably have been anticipated by the boatyard's personnel on December 5, 2003, and that the loss was not caused by any negligence on the part of Hinckley or its employees.

With respect to the physical damage to Mr. Dagnone's boat, in the event that liability exists, the rule in admiralty is well settled that a vessel owner can recover the actual reasonable cost of repairs. *Diesel Tanker Ira S. Bushey, Inc. v. Tug BRUCE A. McALLISTER,* 1995 AMC 806 (SDNY 1994). An owner is entitled to have his vessel repaired in such a way that it will not leave it depreciated in market value. *Dominican Maritime, S.A. v. M/V Inagua Beach*, 572 F.2d 1552 (1st Cir. 1978). If the vessel is repaired to be as strong, serviceable and seaworthy as it was before the casualty, then an award for diminution in value is prohibited. *Id.* (citation omitted).

With respect to the physical damage to his boat, the evidence supports a finding that the fair and reasonable costs to repair Mr. Dagnone's boat is $38,327.00. (Deposition testimony of Thomas Hill; Plaintiff's Exhibit 5).

Regarding Mr. Dagnone's introduction of excerpts from the National Automobile Dealers Association ("NADA") Marine Appraisal Guide ("Blue Book") to establish the fair market value

of his boat (Plaintiff's Exhibit 14), the evidence establishes that the actual length of Mr. Dagnone's boat is 45 feet, 9 inches, <u>not</u> 49 feet, and therefore the information set forth in the NADA Blue Book for a 49-foot Bluewater is not relevant to the case at hand. (Deposition testimony of Thomas Hill; Plaintiff's Exhibit 14).

Addressing Mr. Dagnone's claim for loss of use, defendant must prove actual economic loss to recover such damages. *Central State Transit & Leasing Corporation v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1376-77 (11th Cir. 2000), citing *The Conqueror*, 166 U.S. 110 (1897).[3] The evidence establishes that Mr. Dagnone purchased his boat in his own name, and that he had never documented or registered the boat. (Trial testimony of Nicholas Dagnone). The evidence shows that he never chartered or carried persons for hire, and that the boat was used by him purely for private purposes. (Trial testimony of Nicholas Dagnone). Mr. Dagnone is therefore not entitled to receive loss of use damages. *Id.*.

Dated: June 9, 2006

Respectfully submitted,

THE TALARIA COMPANY, LLC
By its attorney,
NORMAN A. PELOQUIN, II, P.C.

By: ______________________

Norman A. Peloquin, II, Esquire
(R. I. Bar No. 4146)
Of Counsel, Saunders & Saunders, LLP
16 Main Road, P.O. Box 65
Adamsville, RI 02801
Tel. 401.635.9100
Fax. 401.635.9125

[3] *Central State* overruled *Finkel v. Challenger Marine Corp.*, 316 F. Supp. 549 (S.D.Fla. 1970). 206 F.3d at 1377, fn. 3. Dagnone's reliance on the *Finkel* case is in error.

Certificate of Service

I hereby certify that on the 9th day of June, 2006, I served a true copy of the forgoing document upon counsel of record by mailing same, first class, postage prepaid, to: John D. Deacon, Jr., Esquire, 72 Pine Street, Providence, RI 02903.

Attorney at Law