**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| NEW HAMPSHIRE INSURANCE COMPANY,<br>Plaintiff, | : | |
| v. | : | C.A. No. 04-122 ML |
| NICHOLAS DAGNONE,<br>Defendant,<br>Third Party Plaintiff, | : | |
| v. | : | |
| HINCKLEY YACHT SERVICES<br>(The Talaria Company LLC)<br>Third Party Defendant. | : | |

**DAGNONE'S POST-TRIAL MEMORANDUM**
**(THIRD PARTY CLAIM)**

This post-trial memorandum is structured as proposed findings of fact and conclusions of law. The proposed findings and conclusions are numbered sequentially.

1. This action involves property damage and loss of value to a 49 foot motor Yacht owned by Nicholas Dagnone. The Yacht at issue is a model year 1993 Blue Water Yacht, 49 ft. twin gas engines, which Dagnone purchased from the manufacturer in March 1993. On December 6-7, 2003, the Yacht was tied to a dock at Hinckley Yacht Services in Portsmouth, Rhode Island, awaiting outhauling for winter storage on land. A storm these days broke the Yacht loose from the dock and blew it into other boats, docks and pilings, causing damage to the Yacht. In addition, Hinckley had been informed that Dagnone intended to sell the Yacht, and its market value has diminished while Hinckley has been refusing to release it.

2. In the summer of 2002, Dagnone put the Yacht back into the water and kept it at Goat Island Marina in Newport, Rhode Island. In the Fall of 2002, Dagnone employed Ted Beaumont to winterize the Yacht. Beaumont is a licensed captain with 25 years experience in

winterizing power boats, 14 of those years of experience being in the Narragansett Bay area. Dep. Beaumont at 84. Beaumont was an expert regarding the local customs for winterizing boats similar to Dagnone's. Id. at 85.

3. In September of 2003, Dagnone informed the manager of the Goat Island Marina that he would not be using the Yacht any more that season. Dagnone's plan at that time was to keep the vessel stored in the water for the winter, as had been done the previous winter of 2002-2003. However, after early season storms, Dagnone decided to attempt to arrange haul-out and dry storage for the winter of 2003-2004. Goat Island Marina does not provide dry storage, but the manager provided several references of other marinas in the area which offered dry storage. Dagnone instructed Ted Beaumont to winterize the Yacht, but to hold off on winterizing the engines, because he expected to move the boat.

**Early November 2003 Communications**

4. After numerous calls, Dagnone finally located available dry storage at Hinckley Yacht Services in Portsmouth. In early November of 2003, Dagnone had telephone conversations with Hinckley, informing them that he had arranged for a local captain (Ted Beaumont) to drive the boat from Newport to Portsmouth (approximately six miles), and to confirm that Hinckley would haul out the boat for dry storage upon delivery. Hinckley never said anything in these conversations about requiring a written contract, or a payment or deposit.

5. In these conversations, Dagnone informed Hinckley that he intended to sell the boat, and he requested that Hinckley list it for sale. Hinckley declined. There was a "for sale" sign on the boat at all relevant times.

6. Regarding Hinckley's initial discussions with Dagnone in early November, prior to delivery of the boat, James Kerr testified on cross-examination by deposition as follows:

Q. Can you remember exactly what you told him about the procedure for signing a contract in the initial telephone conversation?

A. No, I don't recall. I wouldn't have gone into great detail because, again, it's a customer calling to say they want storage and they want to bring their boat in. Like I said, we get them all the time and they don't show up....

Dep. Kerr, p. 45 lines 2-9. Kerr did not record these initial communications in his customer log, Dx. A. Kerr also testified that Dagnone provided a telephone number, fax number, and cellular telephone number, which Kerr recorded in Dagnone's customer file. The area code (845) is in New York. Exs. 1, 6, 7. The telephone number and fax number connected to locations in New York.

7. Dagnone instructed Ted Beaumont to winterize the engines after he delivered the boat to Hinckley. Beaumont had performed all other winterization tasks on the boat but said that he wanted to wait for Hinckley to haul the boat out before he winterized the engines.

**<u>November 22, 2003</u>**

8. Beaumont delivered the Yacht to Hinckley on Saturday November 22, 2003, docking it at the pier designated by Hinckley personnel. Dep. Beaumont at 56-59. James Kerr, Hinckley's operations manager, was not present at Hinckley's facility on November 22 when Beaumont delivered the Yacht. The only trial witness who was present on that day was Beaumont. Prior to delivering Dagnone's Yacht to Hinckley, Beaumont had performed every requisite item for winterization of the Yacht, except antifreezing the engines. <u>Id</u>. at 59-60. Beaumont, assisted by Hinckley personnel, tied the Yacht to the pier in a seamanlike manner. <u>Id</u>. at 95. As instructed by Hinckley personnel, Beaumont left the keys in the Yacht. <u>Id</u>. at 109-110. Hinckley did not say anything to Beaumont about requiring a signed storage contract or paying a

deposit, nor did Hinckley provide Beaumont with any form of contract, invoice, or any other documents. Dep. Beaumont at 96.

9. Hinckley faxed a form of winter storage contract to Dagnone's fax number in New York on Saturday November 22, 2003. However, Dagnone was not in New York but rather was in Florida during November through mid-December of 2003, and Hinckley was aware that Dagnone was in Florida throughout this period.

10. In the initial communications in early November 2003, Hinckley had been given and had recorded the number for Dagnone's cellular telephone. Dagnone spoke with Hinckley by telephone from Florida on Saturday November 22, 2003, to confirm that they would haul the boat out of the water, and they confirmed. Hinckley never said that they required a signed written contract or deposit or payment before hauling the boat out of the water.

**November 24 to December 6, 2003**

11. On Monday November 24, the first business day after delivery of Dagnone's Yacht, Hinckley assigned James Hilton to be the service manager for Dagnone. It was Hinckley's policy and custom that all communications with a customer flow through the service manager assigned to the customer.

12. Hinckley provided winter storage for approximately 280 boats. All, excepting two large wooden sailboats, were to be hauled out for storage on land. Each of these approximately 280 customers were assigned to one of Hinckley's five service managers. Dagnone's service manager at Hinckley, James Hilton, had more than forty other customers assigned to him.

13. During the last week of November, Dagnone spoke by telephone with an employee of Hinckley to express concern about getting the boat hauled out as soon as possible.

The Hinckley employee, probably James Hilton, told Dagnone not to worry, that his boat would be taken out of the water. The Hinckley employee stated to Dagnone that he was leaving for the Caribbean in a few days, and that Dagnone's boat would be hauled out before he left. Nothing was said in this conversation about requiring a signed storage contract or a payment prior to outhauling the boat. Hilton, in his trial testimony, never denied this conversation. Hilton did not keep any records of any of his conversations with Dagnone. Kerr's customer log, Dx. A, only records conversations by Kerr; it does not include conversations by Hilton or any other Hinckley employee.

14. In the interim between November 22 and December 6, 2003, Beaumont returned to Hinckley three times at periodic intervals to see whether the Yacht had been outhauled so that he could antifreeze the engines. Dep. Beaumont 97-98. On each of these three occasions, the Yacht was docked where he had left it. Beaumont observed on each occasion that Hinckley had numerous boats awaiting outhauling. Id. On the third occasion, around the beginning of December, Beaumont spoke with a Hinckley manager to inquire as to why the Yacht had not been hauled. The Hinckley manager said they had been attempting unsuccessfully to reach Dagnone, for purposes of obtaining a signed storage contract. Dep. Beaumont at 97-98. Nothing was said about payment of a deposit. Dep. Beaumont at 98-99. Beaumont then called Dagnone to have him contact Hinckley. Id. at 97-98.

15. Hinckley never stated to Beaumont that they required a payment from Dagnone prior to outhauling his boat. Dep. Beaumont 98-100. The only supposed requirement ever stated by Hinckley was the statement in early December that they required a signed written contract from Dagnone before outhauling his boat. Id.

**The Real Reason For Hinckley's Delay In Outhauling**

16. Based upon Beaumont's extensive prior experience with Hinckley, and based on his observation of the number of boats and activity at Hinckley in his four visits to Hinckley from November 22 through December 6, 2003, Beaumont concluded that Hinckley's supposed requirement of having a signed written contract prior to outhauling was simply an excuse. Beaumont concluded that the real reason that Hinckley had not hauled Dagnone's boat was that Hinckley was "ridiculously busy with hauling boats out, and . . . they just hadn't gotten to it yet." Id. at 98-100.

17. Beaumont's conclusion in this regard is confirmed by Hinckley's business record, Dx F. This document lists the fifteen vessels which were damaged in the storm, including Dagnone's Yacht. Six of these vessels had been delivered to Hinckley prior to the delivery date of Dagnone's vessel; four of these six owners had signed contracts in October, one had signed a contract on November 3, and the other had signed a contract on November 28. **However, despite the earlier deliveries and earlier signed storage contracts, none of these vessels had been outhauled by Hinckley, and all remained in the water at the time of the storm on December 6-7.**

**18. Contrary to Hinckley's contention, it was not Dagnone's alleged failure to have provided a signed written storage contract that delayed the outhauling of Dagnone's boat. Rather, the outhauling of Dagnone's boat was delayed because Hinckley had accepted so many boats for winter storage that it was unable to outhaul the boats reasonably promptly.**

19. On Wednesday December 3, 2003, Dagnone faxed and arranged delivery of a signed contract and check to Hinckley from Florida. Dagnone called Hinckley on December 3 to

confirm that they had received the fax. Dagnone also requested to Hinckley that they haul the boat out of the water before the approaching storm. At that point, the Hinckley employee responded that they had other boats ahead of Dagnone's, that he had to wait his turn, but that they would get to it that week. Hinckley did not haul the boat out of the water until after the storm on December 6-7.

20. Later in December, subsequent to the storm, Hinckley outhauled the Yacht, and Beaumont antifreezed the engine blocks, completing winterization.

**The Storm Was Less Intense Than Forecast**

21. The storm which occurred on December 6-7, 2003, was forecast well in advance. The wind directions of the storm were as forecast. The actual wind speeds were **less** than were forecast. And the actual wind speeds of the storm were not extraordinary as measured by the fifty-year history of high wind events in the vicinity, and were far less than many other recent high wind events in the vicinity.

22. The National Service forecast for Narragansett Bay on Thursday December 4, 2003 at 10:15 p.m. was as follows: Saturday December 6, NE wind 25 to 35 knots; Sunday December 7, N wind 25 to 35 knots, decreasing to 20 to 25 knots in the afternoon. Dx. Q, pp. 4-5 of 74. As of Friday morning December 5, the forecast was the same, except it also predicted gusts up to 45 knots on Saturday night and into Sunday. Id., pp. 8-9 of 74. Dep. Hill at 37-41.

23. The actual wind speeds of the storm were less than forecast. The National Climatic Data Center official record of weather observations at the closest station—Newport, R.I.—were marked as Px 16. See Dep. Hill at 41-51. On Saturday December 6, the sustained wind speed never exceeded 25 knots, and only very briefly gusted to 35 knots. Px. 16. For most of Saturday December 6, the wind speed was around 20 knots. Id. On Sunday December 7, the

sustained wind speed reached 25 knots only briefly and gusted briefly to 35 knots. For most of the day Sunday, the sustained wind speeds were less than 20 knots, and the gusts were less than 30 knots. Id. See Dep. Hill at 41-51.

**The Storm Was Not Unforeseeably Severe According To Historical Weather Data**

24. The National Climatic Data Center record of storm and high wind events in Newport County, Rhode Island, from 1950 through June 30, 2005 (Px. 17), lists 78 different events, but the storm of December 6-7, 2003 was not sufficiently intense to be included on this list. Many of the recently prior high wind events in the vicinity were far more intense than the storm at issue (Px 18; see Dep. Hill at 51-54), e.g. (from Px 18, id.):[1]

| | | |
|---|---|---|
| 11/13/03 | 50 to 60 mph | (44 to 52 knots) |
| 2/10/01 | 45 to 55 mph | (39 to 48 knots) |
| 12/17/00 | 60 mph | (52 knots) |
| 12/12/00 | 60 mph | (52 knots) |
| 1/21/00 | gusts 45 to 50 mph | (39 to 44 knots) |
| 1/10/00 | gusts to 50 mph | (44 knots) |
| 11/3/99 | gusts to 51 mph | (45 knots) |

**The Lines**

25. Beaumont checked all four of the lines when he left Dagnone's boat at Hinckley. None were frayed, chafed, or worn in any way. Beaumont dep. at 83, 111. James Kerr of Hinckley testified that Dagnone's lines had no visible wear or defects. In addition, it was Hinckley's policy to inspect lines on boats in its custody, and any that are worn or defective would be replaced.

---

[1] The conversion factor between knots and miles per hour is 1 knot = 1.15 miles per hour. Dep Hill at 47-48.

26. After the storm, Hinckley stated to both Dagnone and to Dagnone's insurance agent Matt Marrone that the cause of the boat coming loose was a broken cleat on Hinckley's dock. Dagnone testimony; Marrone deposition; Px 13.

**Confusion At Hinckley**

27. The testimony of the Hinckley witnesses regarding Dagnone's boat is of questionable reliability, because there was another Blue Water Yacht at Hinckley's marina at the time, and Hinckley repeatedly confused the two boats. For example, Hinckley mistakenly invoiced Dagnone $1,000 for an electrical line that Hinckley had supplied to the other Blue Water. And, Hinckley mistakenly put the cushions for Dagnone's boat on the other Blue Water, and told Dagnone that his boat was missing cushions. Testimony of Dagnone, Kerr; Dep. Beaumont at 45-46.

The facts regarding Dagnone's damages are addressed after discussion of the legal points.

**Memorandum of Law**

Dagnone's delivery of the boat to Hinckley for winter storage, in exchange for a fee, was a bailment for hire. Grabbert v. Marina Parks, Inc., 221 A.2d 455 (R.I. 1966); Benedict on Admiralty, § 19.04[D] - 19.05, 19.07 and case cited. A bailment shifts the burden of proof to the defendant. If the boat is damaged while in the marina's custody, the owner may proceed on theories of both bailment and negligence. Id. Under both theories, the marina has the burden of proving, by detailed evidence, that it had exercised all reasonable care under the circumstances, and that the loss or damage resulted from other causes consistent with the marina's exercise of due care. Id.

In addition, § 7-204 of the U.C.C., the "Warehouseman's Act," is also applicable. Benedict, supra § 19.07[F]; Fireman's Fund Ins. Co. v. Captain Fowler's Marina, Inc., 343 F.Supp. 347 (D.Mass. 1971). This statute also shifts the burden of proof to the defendant.

As part of the bailment relationship, a marina warrants that its facilities are safe and adequate for the purpose intended, and the marina may be held liable for defective appliances or equipment which contribute to a loss. Benedict, supra § 19.07[B] and cases cited.

When a marina is on notice of a particular threatening condition -- i.e., a predicted and forecast storm -- it is bound to a higher standard of care, requiring the exercise of special measures. Benedict, supra, § 19.07[C]; see Snyder v. Four Winds Sailboat Centre, 701 F.2d 251 (2d Cir. 1983).

Hinckley did not carry its burden of proof in this case of showing why it was not able to protect boats in its custody from a predicted, foreseen, winter "nor' easter" storm which was not of extraordinary or unforeseeable intensity. However, more importantly, the evidence shows that Hinckley was negligent for failing to have outhauled Dagnone's boat long prior to the storm, as it repeatedly represented to him that it would do. Hinckley was negligent in accepting too many boats for winter storage to enable it to outhaul all these boats with reasonable promptness. It is a reasonable inference that Hinckley's business rationale for accepting too many boats is that the benfit (in the form of revenues and profits) went to Hinckley's bottom line, while the downside risks and potential losses were covered by Hinckley's liability insurer.

Hinckley asserts, as a defense to liability, purported exculpatory clauses in its contract form. Such exculpatory clauses are not effective to evade liability for negligence, unless the language of the clause clearly, unambiguously, and expressly states that liability for negligence

is being excluded. Benedict, supra, § 19.07[E], and cases cited at n. 23; Dowers v. Dowers, 217 A.2d 437 (R.I. 1966). Hinckley's purported exculpatory clauses do not meet this standard.

Regarding damages, the cost of repairs is the standard of measure where the cost of repair is substantially lower than the market value of the boat. See, e.g., Jackson v. Choquette, 80 A.2d 172 (R.I. 1951).

With regard to Dagnone's claims for additional damages -- for loss in value -- an important case is Urico v. Parnell Oil Co., 708 F.2d 852 (1st Cir. 1983). In Urico, plaintiff was financially unable to repair his damaged truck; defendant's insurer refused to settle the repair claim unless plaintiff waived his loss-of-use claim. The truck remained unrepaired. Lost profits evidence was held properly admitted to prove loss-of-use damages beyond the normal repair period for the truck. Damages were awarded for loss of use after expiration of a reasonable time to make repairs.

As to the claim for depreciation in value for the period Hinckley has been withholding the boat, where Hinckley had actual notice that Dagnone intended to sell the boat, Hinckley's refusal to accept responsibility for performing repairs and refusal to release possession of the boat make it liable for the depreciation in value of the boat. Such consequential damages are recoverable if foreseeable, and the courts merely require objective foreseeability; the higher standard that defendant subjectively knew of the likelihood of the particular consequential loss is not legally required. See, e.g., Travellers International, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570 (2d Cir. 1994); Royal College Shop, Inc. v. Northern Insurance Co., 895 F.2d 670 (10th Cir. 1990); Gurney Industries, Inc. v. St. Paul Fire & Marine Insurance Co., 467 F.2d 588 (4th Cir. 1972).

Here, however, there is proof that Hinckley was informed and was subjectively aware, prior to the bailment and prior to the loss, that Dagnone intended to sell the boat.

**Dagnone's Damages**

28. Hinckley estimated the cost of repairs for storm damage at $38,327. Hinckley started the repair work in the winter of 2003-04, and Dagnone paid $8,000 of the estimated cost. Dagnone stopped paying when Hinckley's liability insurance carrier refused to accept responsibility for the damage, and when Dagnone's own insurance company denied coverage. Dagnone testified that, absent insurance coverage, he lacked the financial resources to pay for the full costs of repairs, thereby get possession of the boat, and then sue Hinckley for reimbursement. See Urico v. Parnell Oil Co., 708 F.2d 852 (1st Cir. 1983). Hinckley claimed a lien against the boat and refused to release possession of it from 2004 until settlement of the counterclaim during the trial in April 2006.

29. Dagnone claims recovery of the amounts paid to Hinckley for partial repairs ($8,000), plus the balance of the estimated cost of repair ($38,327 minus $8,000 = $30,327), plus the loss in market value of the boat during the period of Hinckley's detention of the boat from May 2004 to April 2006. Had Hinckley performed its obligation to have repaired the damage to the boat while in bailment in Hinckley's custody, and absent Hinckley's wrongful detention of the boat, Dagnone would have had possession of the boat in April 2004. However, Hinckley did not give Dagnone possession of the boat until April 2006.

30. As to the issue of the amount of loss in market value of the vessel during the period of Hinckley's detention of the boat from May 2004 to April 2006, Dagnone relies upon the NADA Marine "Blue Book" values for the relevant time periods: Summer 2004 to Spring 2006. Px 14. The reliability and use in the marketplace of the NADA Marine Appraisal Guide

as a source for determining the market values of used boats was established by two witnesses. Dagnone formerly engaged in business as a boat dealer, trading in both new and used boats, and he attested to the use and reliability of the NADA Marine Appraisal Guide. In addition Matthew Marrone, the insurance agent, also attested to the use and reliability of the NADA Marine Appraisal Guide, based on its use by the insurance industry for determining market values of used boats.

31. According to the NADA Marine Appraisal Guides (Px 14), the average retail value of Dagnone's boat in Summer 2004 was $144,950; the average retail value in Spring 2006 was $131,200. The difference is a loss in value of $13,750.

32. In sum, Dagnone's damages are: $8,000 + $30,327 + $13,750 = $52,077.

By his attorney,

John D. Deacon, Jr. (#2226)
72 Pine Street - 5th Floor
Providence, RI 02903
Tel: 401-272-8080
Fax: 401-272-8195
jdeacon@lmkbw.com

**Attorney for Nicholas Dagnone**

**Certificate of Service**

I hereby certify that on this 9 day of June 2006, I caused to be emailed and mailed, via First Class U.S. mail, a true copy of the within Plaintiff's Pretrial Memorandum to Norman A. Peloquin, II, Esq., 16 Main Road, P.O. Box 65, Adamsville, RI 02801.

F:\John D\DAGNONE\Post trial memo.doc