UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND


NEW HAMPSHIRE INSURANCE COMPANY

v.

NICHOLAS DAGNONE                                        CA 04-122 ML

v.

THE TALARIA COMPANY, LLC,
d/b/a THE HINCKLEY COMPANY,
a/k/a HINCKLEY YACHT SERVICES


<u>MEMORANDUM AND DECISION</u>

In this action, Third Party Plaintiff Nicholas Dagnone ("Dagnone" or "Plaintiff")

seeks money damages from Third Party Defendant The Talaria Company, LLC, d/b/a

The Hinckley Company, a/k/a Hinckley Yacht Services ("Hinckley" or "Defendant") for

property damage and loss of value to a 49-foot motor yacht owned by Dagnone.  On

April 24, 2006, the Court held a bench trial and heard testimony from both parties; the

Court also accepted deposition testimony from several witnesses who could not appear

before the Court.  For the reasons set forth below, judgment shall enter in favor of

Defendant.

I.  Facts

In early November 2003, Dagnone contacted Hinckley by telephone to make

arrangements to have his yacht delivered to the Hinckley marina in Portsmouth, RI, and

then to be hauled out for dry storage for the winter season of 2003-2004.  Dagnone's

testimony regarding that conversation was that he was not told by the Hinckley

representative he spoke with that Hinckley required a signed contract and partial

payment before it would haul out his boat. Dagnone's account is contradicted by the

testimony of James Kerr, Hinckley's operations manager. Kerr testified that he started

a file on Plaintiff on the day of their first conversation sometime in October or November

2003, and that he told Plaintiff he would need to sign a contract before the boat could

be out-hauled. According to Kerr, Plaintiff stated that his "partner" would be bringing

the boat up and that his "partner" would sign the contract.

The yacht was not delivered to Hinckley until Saturday, November 22, 2003.

Kerr estimated this was about two weeks after his initial conversation with Plaintiff. The

boat was moved to Hinckley by Ted Beaumont, a local captain hired by Dagnone to

move and winterize the boat. Beaumont left the boat on Hinckley's work dock, and, at

the direction of Hinckley employees, left the keys in it. He did not sign any contract

when he left the boat at the Hinckley work dock.

On November 22, 2003, Hinckley faxed a copy of the contract to Dagnone.

Between November 22, 2003 and December 6, 2003, Beaumont returned to Hinckley

on three occasions to see whether the yacht had been out-hauled so that he could

complete the winterization of the vessel. On each occasion, he saw that the boat

remained where he had left it on Hinckley's work dock. On his third trip to the Hinckley

facility, Beaumont asked why the yacht had not yet been hauled out. He was informed

by Kerr that the boat had not been hauled out because there was no signed contract.

On December 3, 2003, Plaintiff faxed a signed copy of the contract and a copy of

a check for partial payment to Hinckley. Also on December 3, Kerr told Dagnone that

the boat would be hauled out by December 10 if the contract was signed and payment

2

was made.  Plaintiff's yacht was placed in the queue of boats to be hauled out after

Plaintiff's conversation with Kerr on December 3.  Kerr testified that the originals of the

signed contract and Plaintiff's check were received by Hinckley on December 10, 2003.

As early as December 4, the National Weather Service forecast for the

Narragansett Bay area predicted a storm with sustained winds of 25-35 knots for

December 6 and 7.  On Friday, December 5, the forecast also predicted gusts up to 45

knots on the night of December 6 into the morning of December 7.

On December 5, 2003, Hinckley personnel moved Plaintiff's yacht from the work

dock where Beaumont had left it to slip # A-10.  Slip # A-10, as depicted on Defendant's

Exhibit S-1, appears to be an area that is more protected than the work dock area.  Kerr

testified that the boat was moved in order "to protect it, put it in a safer location."  The

yacht was secured with Plaintiff's lines, which all parties agree were in good condition

before the storm.

On Saturday, December 6, and Sunday, December 7, a "Nor'easter"[1] hit the

Narragansett Bay area and the Hinckley facility.  Despite Hinckley's efforts to secure

the boats in the marina, there were 14 or 15 boats that were damaged.  The yard itself

sustained damage in the form of broken joints in the docks, bent cleats, a broken cleat,

---

[1] According to the National Oceanic and Atmospheric Administration's National Weather Service, a "Nor'easter" is

> [a] strong low pressure system that affects the Mid Atlantic and New England States. It can form over land or over the coastal waters. These winter weather events are notorious for producing heavy snow, rain, and tremendous waves that crash onto Atlantic beaches, often causing beach erosion and structural damage. Wind gusts associated with these storms can exceed hurricane force in intensity. A nor'easter gets its name from the continuously strong northeasterly winds blowing in from the ocean ahead of the storm and over the coastal areas.

http://www.nws.noaa.gov/glossary/index.php?letter=n

3

and damaged piling rollers.  Plaintiff's boat was among the boats damaged in the storm.
According to Kerr, all of Plaintiff's dock lines broke and a cleat was bent and partially
torn out of the dock, causing Plaintiff's boat to drift to B-dock where it hit two other
boats.  The damage Plaintiff's boat sustained was assessed by Hinckley at $38,327.

## II.  Bailment

Plaintiff correctly contends that his delivery of the yacht to Hinckley for winter
storage, in exchange for a fee, constitutes a bailment for hire.  Grabbert v. Marina
Parks, Inc., 221 A.2d 455, 458 (R.I. 1966).  And Defendant concedes that when a bailor
shows delivery to the bailee and the bailee's failure to return the thing bailed in an
undamaged condition, the bailor has made out a prima facie case of negligence against
the bailee.  Goudy & Stevens, Inc. v. Cable Marine, Inc., 924 F.2d 16, 18 (1st Cir.
1991).  Where the bailor has made out a prima facie case, the bailee must come
forward with evidence to rebut the presumption of negligence and explain its default by
showing facts and circumstances sufficient in law to exonerate it.  Id.

Defendant here argues that Plaintiff cannot take advantage of the presumption
because its possession of the yacht was not exclusive of that of Plaintiff.  Defendant
cites to the trial testimony of Ted Beaumont, the captain hired by Dagnone to move and
winterize the boat.  Beaumont testified that he went to the boatyard three times after
leaving the yacht at the work dock on November 22, and that he physically boarded the
yacht on the last visit to check the condition of the bilge.  Defendant argues that
Beaumont's testimony shows Beaumont had "unfettered" control of the vessel and that,
therefore, the basis for the presumption of negligence fails because "neither party was
in a better position than the other to explain the cause of the damage."  (Def.'s Post-

4

Trial Mem. 6.)

What Defendant ignores, however, is that on December 3, 2003, Defendant received the signed contract from Plaintiff (albeit a faxed copy) and on that same day, Kerr told Plaintiff in their phone conversation that his boat would be put "in queue" for out-hauling.  Defendant further ignores the fact that it took the unilateral action of moving Plaintiff's vessel from the work dock area to Slip A-10, where Hinckley's employees tied Plaintiff's lines to the dock.  At that point, Defendant knew Plaintiff was in Florida and that Beaumont was waiting for Defendant to out-haul the vessel so that he could put anti-freeze in the engines.  Defendant was therefore on notice that Beaumont's only interest in the vessel was to complete the winterization process <u>once it was out of the water</u>.  Given these facts, Defendant's argument as to the presumption of negligence fails.

Defendant must therefore make an affirmative showing of reasonable care to rebut the presumption.  The question comes down to whether the precautions Defendant took to protect Plaintiff's boat in light of the approaching storm of December 6 and 7, 2003 constituted reasonable care.  That inquiry will be made in the context of Defendant's argument that it should be relieved of liability because the damage to Plaintiff's vessel was the result of an "Act of God."

### III.  Act of God

> An act of God has been described as a disturbance of such
> unanticipated force and severity as would clearly preclude
> charging a defendant with responsibility for damage
> occasioned by the defendant's failure to guard against it in
> the protection of property committed to its custody.

<u>Hicks v. Tolchester Marina, Inc.</u>, 1983 WL 709, at *2 (D. Md. Sept. 6, 1983).

Defendant acknowledges that in order to escape liability, it has the burden of proving not only that the storm of December 6 and 7 constituted an act of God, but also that Hinckley was not guilty of any negligence which contributed to the damage caused by the storm. Plaintiff, on the other hand, argues that the evidence he produced shows that the storm was actually <u>less</u> severe than what had been predicted by the National Weather Service on December 4 and December 5 and that the storm was therefore not an Act of God. In order to reconcile these opposing views, the Court must consider the meteorological evidence in some detail.

Both parties agree that the forecasts issued by the National Weather Service on December 4 and December 5 predicted sustained northeast winds of 25-35 knots for Saturday, December 6, and sustained winds of 25-35 knots on Sunday, December 7, decreasing to 20-25 knots in the afternoon. The forecast as of December 5 added a prediction of wind gusts for Saturday night of up to 45 knots.

Defendant's expert witness, Thomas Hill ("Hill"), a marine surveyor with 16 years of experience, testified that he reviewed marine forecasts from the National Oceanic and Atmospheric Administration for December 6 and 7, 2003. Those reports indicated that a "northeast low [was] projected to move up the coastal maritime waters and head east or northeast over George's Bank . . . . There was a gale warning, northeast winds 25 to 35 with gusts to around 40." (Hill Dep. 13:18-23.)

Hill also gathered information about the storm from one of the boat captains who had been at the marina during the storm, as well as the dock master, members of the dock crew, and other boat operators who had been there the night of December 6 and 7, 2003. Hill also inspected and documented the damage to the docks and the boats

6

that were in the boat basin during the storm.

Hill offered his opinion as to the cause of the damages to the boats and docks: "[T]here were two significant factors that contributed to the damage to the dock. The first was the severity of the northeast gale . . . . And the second was the unique direction." (Hill Dep. 15:3-9.) He went on to explain that "[b]ased on observations by the witnesses, the wind direction was absolutely perfectly aligned to allow a sea wave to develop in the fetch between the farthest most distance in the bay and bypassing the point of land to the west of the marina and entering into the basin entrance which is a rather narrow opening." (Hill Dep. 15:10-16.)

He opined that "those two factors with the sustained high winds and a very narrow slot of direction while the sea waves entered into that basin and the energy and waves were bouncing back and forth between the retaining walls and the waves that were bouncing off the walls were meeting the seas that were coming in and they were generating waves probably twice the size of the waves that were entering the basin, and that contributed to and caused the damage to the boat and docks." (Hill Dep. 15:17-16:2.)

On cross-examination, Hill was asked about the significance of weather reports from the National Climatic Data Center Station at Newport, Rhode Island (situated at the Newport Airport), which indicate that wind speeds during the time of the storm were actually recorded as being lower than what had been predicted, with the maximum observed gusts on December 6, 2003 of 36, 35, and 34 knots. Hill acknowledged that although the observation station at the Newport Airport is closer geographically to the Hinckley facility than the weather buoys off Cape Cod and Boston Harbor (data from

7

which Hill had considered in arriving at his opinion), the readings from the Newport location were of little value in determining actual conditions at Hinckley because the Newport station is "in the uplands and surrounded by obstructions that would affect the readings." (Hill Dep. 46:14-15.)

On re-direct, Hill explained the significance of the readings from the weather buoys. Hill compared the forecasted track of the storm (east of Nantucket and across George's Bank) with the weather buoy data for east of Cape Cod (i.e., where the track of the storm was predicted to go) which indicated that by 7:00 p.m. on December 6, the sustained winds had dropped off to less than 10 knots. In Hill's words, "[w]hat that tells you is that the storm track didn't go out over George's Bank. It tells you that the storm track came up over near Narragansett Bay and up through Boston Harbor. . . . In other words, the eye of the storm came closer to Narragansett Bay than it was forecast." (Hill Dep. 59:15-60:8.)

Hill testified that he had been in and around the Hinckley property for 15 years and that he had "never seen another storm event in all of the time [he had] been going in and out of there where the exact same set of weather conditions caused those kind of sea conditions to occur in that basin." (Hill Dep. 60:15-20.)

The Court finds Hill's opinion to be supported by the scientific evidence he utilized as well as the on-the-scene observations of the mariners who were in the Hinckley boat basin during the storm.

The next question the Court must consider is whether, given the weather forecast, moving Plaintiff's boat and tying it up to Slip # A-10 constituted reasonable care on Hinckley's part. Kerr's trial testimony was that the purpose of moving the

vessel from the work dock was to protect it and provide a safer location. The Court's observation of the work dock where Beaumont had left the boat and Slip # A-10 confirms Kerr's testimony. Slip # A-10 is located within the basin, a location that is protected on three sides from Narragansett Bay.

Matthew Marrone, Dagnone's insurance agent, testified that he had a conversation with Rick Burnham from Hinckley on December 10, and that Burnham told him that a cleat had pulled out of the dock, Plaintiff's boat broke loose and struck other vessels. Marrone testified that Kerr, on January 3, 2004, also stated that a cleat pulled out of the dock, Plaintiff's boat broke loose and struck other vessels. Marrone testified that neither Burnham or Kerr said anything about the lines on Plaintiff's boat breaking or parting. Plaintiff also had a conversation with Jim Kerr after the storm and in that conversation, Kerr told Plaintiff that a cleat broke free from the dock and there was damage to Plaintiff's boat.

At trial, Kerr testified that Jack Jennings prepared a summary of damages to the customers' boats, a copy of which was admitted as Defendant's Exhibit F. The entry for Plaintiff's boat reads in pertinent part: "Lines parted, cleat torn partially out of dock, boat drifted to B-dock, hit stern of Integrity and Daisy, boat re-tied up by Stan Parks, Aurora B." (Def.'s Ex. F.) Kerr testified that eight or nine vessels broke free of the dock because their lines had parted during the storm.

Hill was asked his opinion as to whether a single failing cleat would cause the vessel to break free. Hill testified that in his experience, "a single line failure is not the overall reason that a vessel breaks free from a dock. You need to have all the lines part before the vessel is away from the dock." (Hill Dep. 22:15-18.) Hill also observed

9

that Hinckley's docks prior to the storm were in "above-average condition." (Hill Dep. 24:22.) Finally, Hill stated that given the forecast for the storm, Hinckley "acted reasonably and prudently in moving the boat away from the travel lift and into a normal slip. . ." (Hill Dep. 21:14-16.)

## IV. Findings and Conclusion

Taking all of the evidence into account, the Court finds that the storm of December 6 and 7, 2003 was much more severe than had been predicted because its track came further inland, thus passing nearly directly over the Hinckley boatyard. With the unique combination of wind speed and direction, the wave action within the basin could not have been anticipated or guarded against, so much so, that in 15 years, Hill had not seen the degree of damage caused by the storm at the Hinckley boatyard. The Court further finds that Hinckley acted reasonably and responsibly by moving Plaintiff's boat to a more protected location within the marina. Therefore, Defendant is not guilty of any negligence which might have contributed to the damage caused by the storm. Furthermore, because the Court finds Hinckley acted with reasonable care in moving Plaintiff's boat, the presumption of negligence raised by Plaintiff's bailment claim has been successfully rebutted by the evidence. Finally, the Court finds that the storm of December 6 and 7, 2003 was of "such unanticipated force and severity as would clearly preclude charging Defendant with responsibility" for the damages sustained by Plaintiff's boat. Hicks v. Tolchester Marina, Inc., 1983 WL 709, at *2 (D. Md. Sept. 6, 1983).

10

Accordingly, judgment shall enter in favor of the Defendant.

SO ORDERED:

Mary M. Lisi
United States District Judge
July 10, 2006

11